SCJ/JAG:BDF/ABS
F.#2014R01633

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------X

UNITED STATES OF AMERICA

- against -

MIRIAM WILENSKY,

        Defendant.

------------------X

**14 M 1075**

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR AN
ARREST WARRANT

(18 U.S.C. §§ 1349 and 3551 et seq.)

EASTERN DISTRICT OF NEW YORK, ss:

    DANIEL CONNOR, being duly sworn, deposes and states that he is a Special Agent with the Office of Inspector General of the Department of Health and Human Services ("HHS-OIG"), duly appointed according to law and acting as such.

    Upon information and belief, on or about and between February 2008 and February 2011, within the Eastern District of New York and elsewhere, the defendant MIRIAM WILENSKY, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

    (Title 18, United States Code, Sections 1349 and 3551 et seq.)

1

The source of your affiant's information and the grounds for his belief are as follows:

1. I have been an HHS-OIG Special Agent since 2006. During my time with HHS-OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants, and reviewed health care claims data, bank records, telephone records, medical records, invoices, and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare and Medicaid program, along with other health care benefit programs. I am currently assigned to investigate health care fraud violations, including schemes to defraud the Medicare program.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement officers, and (c) information obtained from witnesses. In addition, information pertinent to this investigation was also provided by Medicare Part B Program Safeguard Contractor, Safeguard Services ("Safeguard"), which contracts with the Department of Health and Human Services to perform investigations and audits designed to protect the Medicare program from waste, fraud, and abuse.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of an arrest warrant for the defendant MIRIAM

WILENSKY, I have not set forth each and every fact learned during this investigation. Instead, I have set forth only those facts, in substance and in pertinent part, which I believe are necessary to establish probable cause for the issuance of an arrest warrant.

I.  **BACKGROUND**

   A.  **The Medicare and Medicaid Programs**

   4. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years of age or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

   5. The New York State Medicaid program ("Medicaid") was a federal and state health care program providing benefits to the individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including New York. Individuals who received benefits under Medicaid were similarly referred to as "beneficiaries."

   6. Medicare and Medicaid were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

   7. Medicare was divided into multiple parts. Medicare Part B covered the costs of physicians' services and outpatient care, such as occupational therapy. Generally, Medicare Part B covered these costs only if, among other requirements, they were medically necessary and ordered by a physician.

3

8. Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid was occupational therapy. Generally, Medicaid covered these costs only if, among other requirements, they were medically necessary and ordered by a physician.

9. A physician or occupational therapist who sought to participate in Medicare Part B and Medicaid to bill Medicare and/or Medicaid for the cost of their treatment of Medicare and Medicaid beneficiaries and related benefits, items, and services was required to apply for and receive a provider identification number ("PIN") or provider transaction access number ("PTAN"). The PIN/PTAN allowed a physician or medical clinic to submit bills, known as claims, to Medicare and Medicaid to obtain reimbursement for the cost of treatment and related health care benefits, items, and services that they had supplied to provided to beneficiaries.

10. Medical providers were authorized to submit claims to Medicare and Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services.

11. To receive reimbursement from Medicare for a covered service, a medical provider was required to submit a claim, either electronically or in writing, through Form CMS-1500 or UB-92. To receive reimbursement from Medicaid for a covered service, a medical provider was required to submit a claim, either electronically or in writing, through New York State eMedNY-150003 Claim Form. Both claim forms required certain important information, including (a) the beneficiary's name and identification number; (b) the PIN/PTAN of the doctor, occupational therapist, or other qualified health care provider who

4

order the health care benefit, item, or service that was the subject of the claim; (c) the health care benefit, item, or service that was provided or supplied to the beneficiary; (d) the billing codes for the benefit, item, or service; (e) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (f) whether or not the beneficiary was also a Medicaid or Medicare recipient. By submitting the claim, the provider was certifying, among other things, that the services were rendered to the patient and were medically necessary.

12. Providers submitted to Medicare claims using billing codes, also called current procedural terminology or "CPT" codes, which were numbers referring to specific descriptions of the medical services provided to beneficiaries.

13. Under Medicare, occupational therapy services are only reimbursable if they are performed by a licensed physical or occupational therapist, or a licensed physical or occupational therapy assistant directly supervised by a licensed physical or occupational therapist. Occupational therapy aides are not licensed or authorized under New York State law to perform physical therapy and Medicare does not reimburse for the services that aids provide.

**B.   Relevant Individuals and Medical Clinics**

14. Prime Care on the Bay, LLC ("Prime Care") and Bensonhurst Mega Medical P.C. ("Bensonhurst") were New York State corporations. Prime Care was located at 1711 Sheepshead Bay Road in Brooklyn, New York. Bensonhurst was located nearby at 2761 Bath Avenue in Brooklyn, New York. Both Prime Care and Bensonhurst were authorized to participate in Medicare and Medicaid. They purported to provide, among other

things, physical therapy, occupational therapy, and diagnostic tests to Medicare and Medicaid beneficiaries.

15. Valentina Kovalienko was the owner-in-fact and manager of Prime Care and Bensonhurst. In that capacity, she directed and assisted in the "recruitment" of Medicare and Medicaid beneficiaries to Prime Care and Bensonhurst, managed the flow of money into and out of the clinics, and established the clinics' policies.

16. Eldar Kadymoff was the medical director at Prime Care.

17. The defendant MIRIAM WILENSKY was employed as an occupational therapist at Prime Care and Bensonhurst between approximately February 2008 and February 2011. As part of her employment, she was enrolled to participate in the Medicare and Medicaid programs and received a unique Prime Care PIN/PTAN. During the time she was employed at Prime Care and Bensonhurst, WILENSKY was also enrolled to participate in the Medicare and Medicaid programs at approximately five other clinics, including Medical Clinics A, B, and C which were medical clinics in Brooklyn known to the affiant.

## II. THERE IS PROBABLE CAUSE TO BELIEVE THAT THERE WAS A CONSPIRACY TO DEFRAUD MEDICARE AT PRIME CARE AND BENSONHURST

18. On July 11, 2014, a Grand Jury sitting in the Eastern District of New York returned a Second Superseding Indictment charging Eldar Kadymoff and Valentina Kovalienko, among others, with, among other things, conspiracy to commit health care fraud and health care fraud. (United States v. Kovalienko, et al., 11-CR-106 (S-2) (RRM)). Among other things, the Second Superseding Indictment alleges that Kadymoff and Kovalienko executed a fraudulent scheme in which they enriched themselves by (1)

6

artificially and corruptly increasing the demand for medical services by providing Medicare and Medicaid beneficiaries with cash payments of approximately $40 per visit to induce those beneficiaries to subject themselves to medically unnecessary procedures, services and tests; (2) submitting and causing to be submitted claims to Medicare and Medicaid for medically unnecessary services to beneficiaries, such as physical therapy, occupational therapy and diagnostic testing; (3) submitting and causing to be submitted to claims to Medicare and Medicaid for physical therapy and occupational therapy services that were not supervised and not performed by professionals trained and authorized to perform those medical services; and (4) they engaged in deceptive acts and contrivances intended to hide information, mislead, avoid suspicion and avert further inquiry into the nature of the services offered at Prime Care and Bensonhurst. More specifically, the Second Superseding Indictment alleges that Kovalienko and Kadymoff, working with others, created and caused to be created medical files containing false information about the services provided and the medical necessity of those services. These files containing false information were based on uniform templates and filled in with superficial medical notes designed to conceal the fact that services were not medically necessary and not performed. For example, physical therapists and occupational therapists would sign medical paperwork as though they had rendered physical and occupational therapy services that had, in fact, been rendered by unsupervised, unlicensed and unauthorized aides. The Second Superseding Indictment also alleges that Kovalienko and Kadymoff paid occupational and physical therapists to allow bills to be submitted in their names and to sign patient charts reflecting that they had provided physical and occupational therapy services when, in fact, those physical and occupational therapy services were performed by unlicensed and unauthorized aides. By

spreading out billings for physical and occupational therapy services among several physical and occupational therapists, Prime Care and Bensonhurst were able to cover up and conceal the excessive amounts of physical and occupational therapy being billed.

### III. THERE IS PROBABLE CAUSE TO BELIEVE THAT THE DEFENDANT WAS A MEMBER OF THE HEALTH CARE FRAUD CONSPIRACY AT PRIME CARE AND BENSONHURST

19. Based on the information set forth below, there is probable cause to believe that from approximately February 2008 to February 2011, the defendant MIRIAM WILENSKY agreed to participate in the scheme set forth in the July 11, 2014 Second Superseding Indictment described in the previous paragraph.

#### A. False Claims to Medicare and Medicaid and Fraudulent Medical Paperwork

20. Analysts with Safeguard reviewed Medicare claims data describing all of the claims submitted to Medicare under the defendant MIRIAM WILENSKY's PINs/PTANs during the period of 2008 to 2011. They then compared the number of claims submitted under WILENSKY's PINs/PTANs to the number of claims submitted by all other occupational therapists in the United States enrolled in Medicare. The comparison shows that, among providers enrolled as specialists in occupational therapy for the period between 2008 and 2011, WILENSKY was the fourth-highest biller of occupational therapy services in the country. During that period, claims were submitted under WILENSKY's various PINs/PTANs for approximately $4,076,979 and, as a result of those claims, Medicare paid approximately $2,129,432.

8

21. Safeguard's review of Medicare claims data shows multiple days on which claims were submitted to Medicare for services purportedly rendered by WILENSKY that could not realistically have been provided by her.

    a. Many of the occupational therapy CPT codes used in the claims submitted under WILENSKY's PINs/PTANs are "timed codes" based on the amount of time spent with a patient. These services are often billed in increments of 15 minutes. However, Medicare rules and regulations allow a provider to bill for one 15-minute code after spending only 8 minutes with a patient. Thus, in one 8-hour workday, an occupational therapist could bill for at most 60 15-minute units of physical therapy services. These 60 units would reflect 900 minutes (15 hours) of coded time, assuming that no more than 8 minutes of occupational therapy services were rendered for each occupational therapy service billed and no breaks were taken. A review of the claims for occupational therapy services purportedly rendered by WILENSKY under her various PINs/PTANs reveals that more than 15 hours of occupational therapy services were often billed for in a single day.

    b. Claims indicating approximately 13.50 hours of occupational therapy services purportedly rendered by WILENSKY to 22 unique patients on November 10, 2008 were submitted under WILENSKY's PIN/PTAN at Prime Care. Claims indicating approximately 11.7 hours of occupational therapy services purportedly rendered by WILENSKY to 16 unique patients on that same day were also submitted under WILENSKY's PIN/PTAN at Medical Clinic A. Claim indicating approximately 4.00 hours of occupational therapy services purportedly rendered by WILENSKY to 8 unique beneficiaries that same day were also submitted under WILENSKY's PIN/PTAN at Medical Clinic C.

c. Claims indicating approximately 17.55 hours of occupational therapy services purportedly rendered by WILENSKY to 28 unique patients on November 20, 2008 were submitted under WILENSKY's PIN/PTAN at Prime Care. Claims indicating approximately 5.03 hours of occupational therapy services purportedly rendered by WILENSKY to 8 unique patients on that same day were also submitted under WILENSKY's PIN/PTAN at Medical Clinic A. Claims indicating approximately 10.35 hours of occupational therapy services purportedly rendered by WILENSKY to 13 unique beneficiaries that same day were also submitted under WILENSKY's PIN/PTAN at Medical Clinic C.

d. Claims indicating approximately 6.30 hours of occupational therapy services purportedly rendered by WILENSKY to 9 unique patients on November 23, 2009 were submitted under WILENSKY's PIN/PTAN at Prime Care. Claims indicating approximately 51.08 hours of occupational therapy services purportedly rendered by WILENSKY to 73 unique patients on that same day were also submitted under WILENSKY's PIN/PTAN at Medical Clinic B.

e. Claims indicating approximately 38.85 hours of occupational therapy services purportedly rendered by WILENSKY to 52 unique patients on March 1, 2010 were submitted under WILENSKY's PIN/PTAN at Medical Clinic B. Claims indicating approximately 13 hours of occupational therapy services purportedly rendered by WILENSKY to 23 unique patients on that same day were also submitted under WILENSKY's PIN/PTAN at Prime Care.

f. Claims indicating approximately 31.68 hours of occupational therapy services purportedly rendered by WILENSKY to 45 unique patients on March 2, 2010 were

submitted under WILENSKY's PIN/PTAN at Medical Clinic B. Claims indicating approximately 10.25 hours of occupational therapy services purportedly rendered by WILENSKY to 17 unique patients on that same day were also submitted under WILENSKY's PIN/PTAN at Prime Care.

        g.     Claims indicating approximately 22.62 hours of occupational therapy services purportedly rendered by WILENSKY to 41 unique patients on October 1, 2010 were submitted under WILENSKY's PIN/PTAN at Medical Clinic B. Claims indicating approximately 6.23 hours of occupational therapy services purportedly rendered by WILENSKY to 10 unique patients on that same day were also submitted under WILENSKY's PIN/PTAN at Prime Care.

        h.     Claims indicating approximately 22.07 hours of occupational therapy services purportedly rendered by WILENSKY to 43 unique beneficiaries on January 26, 2011 were submitted under WILENSKY's PIN/PTAN at Medical Clinic B. Claims for approximately 0.78 hours of occupational therapy services purportedly rendered by WILENSKY to 2 patients were also submitted under WILENSKY's PIN/PTAN at Prime Care.

        22.     I have also reviewed Medicare and Medicaid claims data for services submitted on behalf of the defendant MIRIAM WILENSKY under her various PINs/PTANs. The Medicare and Medicaid claims data also shows that claims were submitted and paid for occupational therapy services purportedly rendered by WILENSKY on days when WILENSKY was outside of the country and thus incapable of providing those services. For example:

11

    a.  Travel records show that WILENSKY departed the United States for Cancun, Mexico on January 13, 2009 and did not return until January 20, 2009. However, approximately $37,683 in claims was submitted to Medicare and Medicaid under WILENSKY's Prime Care PIN/PTAN for services purportedly rendered by WILENSKY at Prime Care during that time period, resulting in payments of approximately $36,987.

    b.  Travel records show that WILENSKY departed the United States for Tel Aviv, Israel on October 28, 2009 and did not return until November 9, 2009. However, approximately $64,459 in claims was submitted to Medicare and Medicaid under WILENSKY's Prime Care PIN/PTAN for services purportedly rendered by WILENSKY at Prime Care during that time period, resulting in payments of approximately $57,346. In addition, approximately $44,948 in claims was submitted to Medicare for services purportedly rendered by WILENSKY at Medical Clinic A during that same time period, resulting in further payments of approximately $29,224.

    c.  Travel records show that WILENSKY departed the United States for Montego Bay, Jamaica on January 14, 2010 and did not return until January 17, 2010. However, approximately $35,376 in claims was submitted to Medicare and Medicaid under WILENSKY's Prime Care PIN/PTAN for services purportedly rendered by WILENSKY at Prime Care during that time period, resulting in payments of approximately $20,914. In addition, approximately $7,032 in claims was submitted to Medicare for services purportedly rendered by WILENSKY at Medical Clinic A during that same time period, resulting in further payments of approximately $5,063.

    d.  Travel records show that WILENSKY departed the United States for Cancun, Mexico on March 23, 2010 and did not return until March 30, 2010.

However, approximately $69,529 in claims was submitted to Medicare and Medicaid under WILENSKY's Prime Care PIN/PTAN for services purportedly rendered by WILENSKY during that time period, resulting in payments of approximately $36,309. In addition, approximately $42,189 in claims was submitted to Medicare for services purportedly rendered by WILENSKY at Medical Clinic A during that same time period, resulting in further payments of approximately $28,320.

23.   I have reviewed patient charts and superbills — a medical document with lists of CPT codes that is used by providers to identify the service for which they should be reimbursed — seized from the Prime Care clinic pursuant to a search warrant executed in February 2011. My review indicates that, on several occasions, the defendant MIRIAM WILENSKY signed patient charts and superbills indicating that occupational therapy services were performed by WILENSKY on days when WILENSKY was outside of the country and incapable of performing those services. For example:

   a.   A file for patient Z.S. contains occupational therapy progress notes documenting services purportedly performed by WILENSKY on October 28, 2009, and on November 2, 4, 6, and 9, 2009, when travel records show she was in Tel Aviv, Israel.

   b.   A file for patient G.M. documents services purportedly performed by WILENSKY on March 23, 2010 and March 25, 2010; a file for patient V.R. documents services purportedly performed by WILENSKY on March 24, 2010; a file for patient V.C. documents services purportedly performed by WILENSKY on March 24, 2010; and a file for patient Z.S. documents services purportedly performed by WILENSKY on March 24, March 26, and March 29, 2010. In addition, I found within the search warrant materials 42 separate superbills documenting services purportedly performed by

13

WILENSKY on March 25, 2010. Travel records show that WILENSKY was in Cancun, Mexico on each of those days.

      c.    Each of these notes and superbills described above bears a signature in the name of WILENSKY that matches a signature sample WILENSKY provided to Medicare auditors in August 2011.

### B. Phone Calls to WILENSKY Monitored by Law Enforcement Officers with the Consent of Cooperating Witness 1

      24.    Cooperating Witness 1 ("CW 1"), whose identity is known to your affiant, has pleaded guilty to the crime of conspiracy to commit health care fraud. On February 18, 2014, CW 1, acting at the direction of law enforcement officers, called MIRIAM WILENSKY and told WILENSKY that CW 1 had been approached by law enforcement officers regarding the fraud scheme at Prime Care and Bensonhurst. The call was recorded by law enforcement officers, with CW 1's consent.

      25.    On several occasions during the February 18 call, WILENSKY generally denied that anything improper had occurred at the clinic.

      a.    For example, WILENSKY stated as follows: "All the patients got treated. There was not one patient that would just come in and not get treated. Not even one."

      b.    WILENSKY also told CW 1 that WILENSKY had properly billed for her services:

> We did not bill units, Medicare units, where is has to be one-on-one, or not one-on-one, but time. And maybe I'm wrong, but from what the doctors handed out at me when I got my job and explained to me because I was like why don't we only treat patients for like 30, 40 minutes and not like an hour, whatever, why don't we

14

> have to write time, too, they told me because we're billing as an article and it's like straight up visits. It's not time. Maybe they're trying to confuse you right now, you known later on it would've been a lot of insurance — Medicare, where you have to be very careful with your time, but here I billed therapeutic exercise.

  c. WILENSKY also stated that she was shown licenses for the aides at the clinic, telling CW 1 the following: "First of all, why would you know if the aides are not licensed? First of all, they showed me a license. There were licenses taken up in the office. You know, that room before you. Not for me to know; not for you to know."

  d. WILENSKY also told CW the following: "And I don't really give a shit if they have evidence. Let them have evidence. Let them put me into fucking jail. I don't give a flying fuck, but it's not our problem because we worked. We did our notes; we treated the patients and that's the bottom line. And the next time they come, say, 'I really feel uncomfortable.'"

  26. Despite these self-serving denials, at other times on the February 18 call WILENSKY encouraged CW 1 not to disclose information to law enforcement officers. For example, WILENSKY told CW 1 that CW 1 would get CW 1 and others in trouble if CW 1 spoke to law enforcement officers:

> Next time say, "I want an attorney." You're going to get yourself in trouble. And you're going to get other people in trouble. My advice to you is not to talk to them anymore. If they want to talk to you, you need an attorney present. If you need the number of an attorney, I have many that would help you. I have a few very good attorneys.

  27. On March 19, 2014 CW 1, acting at the direction of law enforcement officers, called MIRIAM WILENSKY and reported that law enforcement officers had

interviewed CW 1's employer. The call was recorded by law enforcement officers, with CW 1's consent.

28. During the March 19, 2014 call WILENSKY again encouraged CW 1 not to talk to law enforcement officers. For example, WILENSKY stated as follows:

> I'm saying don't get, you know, me in trouble. I didn't do anything. You have to make sure that you, you know, you make sure what they were doing, you don't know. I don't know what they were doing.

a. At another point during the call, WILENSKY instructed CW 1 to tell law enforcement officers the following: "Ok, what if you were telling them it was billing you weren't aware of? How's that like?"

b. WILENSKY also told CW 1 the following: "You should take the day off. I want to go with you. I want to, like, tell you a lot of stuff because it's not a phone conversation and basically, let's take a day off and go with you to an attorney. If you want, I'll go with you to the attorney."

c. Towards the end of the phone call WILENSKY gave CW 1 instructions on how to respond to law enforcement officers:

> If your signature is on everything, that's one thing, you know. And still there's like a way out. But if your, if your, signature is not on a lot of documents or bills that were maybe billed. Then, then, you known, then, then, I don't know. What was billed doesn't mean it was seen by you and doesn't mean that you did that fraud. You understand what I'm saying? It doesn't mean you did that fraud. It could them doing that fraud. So this is, they billed under your license doesn't mean that you were there. There's always what's called plausible deniability. Or, it is plausible because you can say I was there for four hours

16

and the amount of patients I saw in four hours was about, you know, 12 patients a day or whatever. 14 patients a day. If someone's billing 50 patients a day under me, that's not my problem. You know. Something like that. I don't know. You need to go to an attorney. I'm going to drag you to an attorney.

### C. Phone Calls to WILENSKY Monitored by Law Enforcement Officers with the Consent of Cooperating Witness 2

29. Cooperating Witness 2 ("CW 2"), whose identity is known to your affiant, has pleaded guilty to the crime of conspiracy to commit health care fraud. On September 4, 2014 CW 2, acting at the direction of law enforcement officers, called MIRIAM WILENSKY and told WILENSKY that CW 2 had been approached by law enforcement officers regarding the fraud scheme at Prime Care and Bensonhurst. The call was recorded by law enforcement officers, with CW 2's consent.

30. On several occasions during the call, WILENSKY encouraged CW 2 not to talk to law enforcement officers.

    a. For example, WILENSKY told CW 2 "first of all, you don't know." WILENSKY then told CW 2 the following: "First of all, don't say anything. Your attorney is going to have to deal with this."

    b. WILENSKY further stated: "You don't have to say anything. You don't have to rat. There's nothing to rat. Like, there's nothing to rat. I am not Valentina. I don't give a fuck about her."

    c. WILENSKY then told CW 2 the following: "Just if you need to say I brought you in, if you need to say that, you know, like, I was writing. I don't know, I

don't know what you want to say. Don't give more information than you need to, obviously, and that's in regard to me and everybody."

        d.     WILENSKY also encouraged CW 2 not to tell the truth by telling CW 2 that CW 2 had nothing to gain by telling the truth. WILENSKY stated the following:

> So, what are you going to do by telling them the truth? I, I, I, that's what I don't understand. Either you have to go to another attorney. I'm sorry, I'm not being right now defensive myself, I'm trying to reason with you. What are you going to gain by telling them the supposed truth? That you didn't sign? That you weren't there?

When CW 2 then told WILENSKY that CW 2 could go to prison, WILENSKY stated as follows: "You're going to go then. If you admit to all this, you're going to go to prison regardless." CW 2 responded by asking WILENSKY what CW 2 should do and whether CW 2 should lie. WILENSKY stated as follows: I don't know. I don't know what to do. Your attorney is supposed to tell you what to do, a good attorney. He's just telling you to be truthful?" When CW 2 responded "yes," WILENSKY stated: "That's bullshit! I mean, if that's what they want."

        31.     At other times on the call, WILENSKY denied that anything improper had happened at the clinic, telling CW 2, "obviously, I don't want you to throw me under the bus. I don't know what you could throw me under the bus for, except the fact that I brought you in there." WILENSKY also repeatedly told CW 2 that patients did receive treatment.

        32.     Near the end of the phone call WILENSKY told CW 2 that she regretted getting involved in the conduct at Prime Care:

> You're not guilty. The only thing that you were doing, that we were all doing, that was finagled because of the pressure she put on us and the crazy pressure that she put on us . . . . The crazy fucking pressure of, like, you feeling you can't get out. That she put on all of us. I agree with you. It was crazy pressure and we did shit. We did stupid shit. We did stupid shit that I never want to do again in my whole life. I did stupid shit. Me writing all those notes. Just writing them. Physically writing them and just sitting there until 7:00, 8:00 and just running back and forth and just getting like, you, involved. Like I just feel guilty and I regret the day I fucking met her. That's all I need to say. That I regret the day I met her.

Wherefore, your affiant respectfully requests than an arrest warrant be issued for defendant MIRIAM WILENSKY so that she may be dealt with according to law. Your affiant respectfully requests that this affidavit and arrest warrant be filed under seal so as to protect the integrity of the ongoing investigation, except that law enforcement officers may disclose this affidavit as necessary to effectuate the arrest and arraignment of the defendant.

_____
DANIEL CONNOR
Special Agent, HHS-OIG.

Sworn to before me this
17th day of December, 2014

_____
THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

19